1   Lynette Gridiron Winston (#151003)
2       lwinston@afrct.com
    ANGLIN, FLEWELLING, RASMUSSEN,
3       CAMPBELL & TRYTTEN LLP
    199 S. Los Robles Avenue, Suite 600
4   Pasadena, California  91101-2459
    Tel: (626) 535-1900 | Fax: (626) 577-7764
5
6   Attorneys for Defendant
    WELLS FARGO BANK, N.A.
7

8                 UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

10

11  JAMES T. WILLIAMS AND          CASE NO.: EDCV13-02075 JVS (DTBx)
12  STEPHANIE WILLIAMS,
                                   **DEFENDANT WELLS FARGO'S**
13                                 **NOTICE OF MOTION AND MOTION**
                                   **TO DISMISS FIRST AMENDED**
14              Plaintiffs,        **COMPLAINT; MEMORANDUM OF**
                                   **POINTS AND AUTHORITIES**
15        v.
16                                 *[Filed with Motion to Strike Portions of*
17  WELLS FARGO BANK, N.A., a      *First Amended Complaint]*
    business entity form unknown, and
18  NDEX WEST, LLC, a business entity   Date:    April 21, 2014
    form unknown, and DOES 1-100,   Time:    1:30 p.m.
19  inclusive,                      Ctrm:    10C
20
21              Defendants.
22                                 *[Assigned to the Hon. James V. Selna]*
23
24
25
26
27
28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 21, 2014, at 1:30 p.m., or as soon thereafter as the matter may be heard, in Courtroom 10C of the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California 92701-4516, the Hon. James V. Selna presiding, defendant WELLS FARGO BANK, N.A. (successor by merger with Wells Fargo Bank Southwest, N.A., f/k/a Wachovia Mortgage, FSB, f/k/a World Savings Bank, FSB) ("Wells Fargo"), will move the Court for an Order, pursuant to Federal Rules of Civil Procedure 12(b)(6), dismissing all claims for relief in the First Amended Complaint attached hereto as Exhibit A.

Grounds for the motion to dismiss are:

1.    First Claim for Relief: Negligence.

Plaintiffs fail to state a claim for relief for negligence because: (i) the claim is preempted by HOLA; (ii) Wells Fargo owed no duty of care to plaintiffs; (iii) plaintiffs fail to plead the required elements; (iv) plaintiffs fail to plead facts sufficient to constitute a claim for relief; and (v) plaintiffs have no right to a loan modification.

2.    Second Claim for Relief: Violation of Business & Professions Code § 17200.

Plaintiffs fail to state a claim for relief for violation of Business & Professions Code § 17200 because: (i) the claim is preempted by HOLA; (ii) plaintiffs fail to plead the required elements; (iii) plaintiffs fail to plead facts sufficient to constitute a claim for relief; and (iv) plaintiffs lack standing because they suffered no loss of money or property.

This Motion is based on this notice, the memorandum of points and authorities, the Request for Judicial Notice, the Complaint, and on Wells Fargo's argument at the hearing.

**Compliance with Local Rule 7-3.** This motion was filed following a

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1    conference under Local Rule 7-3 on March 5, 2014.

2                                        Respectfully submitted,

3    Dated: March 13, 2014               ANGLIN, FLEWELLING, RASMUSSEN,
                                          CAMPBELL & TRYTTEN LLP
4

5
                                         By:    /s/ Lynette Gridiron Winston
6                                               Lynette Gridiron Winston
                                                lwinston@afrct.com
7                                        Attorneys for Defendant
                                         WELLS FARGO BANK, N.A.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO.: EDCV13-02075 JVS (DTBX)
DEF. WELLS FARGO'S NOTICE OF MOTION
AND MOTION TO DISMISS FAC

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES...........................................1

1.    INTRODUCTION..................................................................................1

2.    SUMMARY OF THE FAC AND JUDICIALLY NOTICEABLE
      DOCUMENTS .......................................................................................2

3.    PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY
      HOLA.....................................................................................................4

      A.    As A Federal Savings Bank, World Savings Operated Under
            HOLA.........................................................................................4

      B.    Case Law Confirms The Post-Merger Application Of HOLA............4

      C.    OTS Regulations Promulgated Under HOLA Preempt Any
            State Laws Which Affect Loan Origination, Disclosures, And
            Lending Regulation....................................................................6

      D.    State Laws Preempted By HOLA. ...........................................7

      E.    Plaintiffs' State Law Claims Are Preempted By HOLA.....................7

4.    PLAINTIFFS CANNOT STATE A VIABLE CLAIM FOR
      NEGLIGENCE ......................................................................................9

5.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER BUSINESS &
      PROFESSIONS CODE § 17200.........................................................12

      A.    Plaintiffs Have Not Alleged A Violation Of § 17200. ......................12

      B.    Plaintiffs Also Lack Standing To Allege A UCL Claim. ...................15

6.    CONCLUSION ....................................................................................16

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Babb v. Wachovia Mortg., FSB*
2013 U.S. Dist. LEXIS 106228 (C.D. Cal. July 26, 2013) ................................ 6

*Cerecedes v. U.S. Bankcorp*
2011 U.S. Dist. LEXIS 75559 (C.D. Cal. July 11, 2011) .............................. 13

*DeLeon v. Wells Fargo Bank, N.A.*
2011 U.S. Dist. LEXIS 8296 (N.D. Cal. 2011).................................................. 15

*DeLeon v. Wells Fargo Bank, N.A.*
729 F. Supp. 2d 1119 (N.D. Cal. 2010) ............................................................ 6

*Edwards v. Marin Park, Inc.*
356 F.3d 1058 (9th Cir. 2004).......................................................................... 14

*Gomez v. Wachovia Mortg. Corp.*
2010 U.S. Dist. LEXIS 3799 (N.D. Cal. Jan. 15, 2010) .................................... 9

*Hoffman v. Bank of America, N.A.*
2010 U.S. Dist. LEXIS 70455 (N.D. Cal., June 30, 2010) .............................. 11

*Isabel Mata v. Wells Fargo Bank, N.A.*
2013 U.S. Dist. LEXIS 108197 (C.D. Cal. July 31, 2013) ................................ 8

*Ismail v. Wells Fargo Bank, N.A.*
2013 U.S. Dist. LEXIS 32594 (E.D. Cal. Mar. 8, 2013) ................................... 8

*Kaplan v. Wells Fargo Bank, N.A.*
2013 U.S. Dist. LEXIS 109023 (C.D. Cal. July 30, 2013) ................................ 8

*Kearns v. Ford Motor Co.*
567 F.3d 1120 (9th Cir. 2009)......................................................................... 13

*Martinez v. Welk Group, Inc.*
2011 U.S. Dist. LEXIS 58718 (S.D. Cal. June 2, 2011) .................................. 13

*Melegrito v. CitiMortgage Inc.*
2011 U.S. Dist. LEXIS 60447 (N.D. Cal. June 6, 2011) ................................. 12

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ii

*Murr Plumbing, Inc. v. Scherer Bros. Fin. Serv. Co.*
  48 F.3d 1066 (8th Cir. 1995) ............................................................. 14

*Nguyen v. Wells Fargo Bank, N.A.*
  749 F. Supp. 2d 1022 (N.D. Cal. 2010) ......................................... 12

*Progressive Consumers Fed. Credit Union v. United States*
  79 F.3d 1228 (1st Cir. 1996) .............................................................. 5

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*
  806 F.2d 1393 (9th Cir. 1986) ......................................................... 14

*Sharma v. Wachovia*
  2011 U.S. Dist. LEXIS 1736 (E.D. Cal. Jan. 6, 2011) .................. 8, 9

*Silvas v. E*Trade Mortg. Corp.*
  514 F.3d 1001 (9th Cir. 2008) ........................................................... 7

*Slipak v. Bank of Am., N.A.*
  2011 U.S. Dist. LEXIS 131079 (E.D. Cal. Nov. 10, 2011) ............ 13

*Villa v. Wells Fargo Bank, N.A.*
  2010 U.S. Dist. LEXIS 23741 (S.D. Cal., Mar. 15, 2010) ............. 11

## STATE CASES

*Akopyan v. Wells Fargo Home Mortg., Inc.*
  215 Cal. App. 4th 120 (2013) ......................................................... 5, 6

*Cel-Tech Comm'cns, Inc., v. L.A. Cellular Tel. Co.*
  20 Cal. 4th 163 (1999) ...................................................................... 13

*Daro v. Superior Court*
  151 Cal. App. 4th 1079 (2007) .......................................................... 15

*Eddy v. Sharp*
  199 Cal. App. 3d 858 (1988) ............................................................. 10

*Hall v. Time, Inc.*
  158 Cal. App. 4th 847 (2008) ............................................................ 13

*Hamilton v. Greenwich Investors XXVI, LLC*
  195 Cal. App. 4th 1602 (2011) .......................................................... 15

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

*Ingels v. Westwood One Broadcasting Services, Inc.*
  129 Cal. App. 4th 1050 (2005)................................................................ 13

*Khoury v. Maly's, Inc.*
  14 Cal. App. 4th 612 (1993)................................................................... 12

*Korea Supply Co. v. Lockheed Martin Corp.*
  29 Cal. 4th 1134 (2003)....................................................................... 12

*LiMandri v. Judkins*
  52 Cal. App. 4th 326 (1997)................................................................. 10

*Lopez v. World Savings & Loan Ass'n*
  105 Cal. App. 4th 729 (2003)................................................................. 6

*Lueras v. BAC Home Loans Servicing, LP*
  221 Cal. App. 4th 49 (2013)................................................................. 11

*Mabry v. Superior Court*
  185 Cal. App. 4th 208 (June 2, 2010) .................................................. 11

*Maudlin v. Pacific Decision Sciences Corp.*
  137 Cal. App. 4th 1001 (2006)............................................................... 5

*Nymark v. Heart Fed. Savs. & Loan Ass'n,*
  231 Cal. App. 3d 1089 (1991) .............................................................. 10

*Peterson v. Cellco P'ship*
  164 Cal. App. 4th 1583 (2008).............................................................. 15

*Saunders v. Superior Court*
  27 Cal. App. 4th 832 (1994)................................................................. 13

*Software Design and Application Ltd. v. Hoeffer & Arnolt Inc.*
  49 Cal. App. 4th 472 (1996)................................................................. 10

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*
  17 Cal. 4th 553 (1998)....................................................................... 15

*Weiss v. Washington Mutual Bank*
  147 Cal. App. 4th 72 (2007)............................................................. 7, 9

# FEDERAL STATUTES

12 U.S.C. § 215a (e) ...................................................................................... 5

12 U.S.C. § 215(e) ......................................................................................... 5

12 U.S.C. § 1461 ............................................................................................ 4

18 U.S.C. § 1341 .......................................................................................... 14

18 U.S.C. § 1343 .......................................................................................... 14

18 U.S.C. § 1962 .......................................................................................... 14

# STATE STATUTES

Cal. Bus. & Prof. Code § 17200 ...........................................................passim

Cal. Civ. Code § 2923.4 ............................................................................... 11

Cal. Civ. Code § 2923.5 ...........................................................8, 11, 13, 16

Cal. Civ. Code § 2923.6 ................................................................................ 1

Cal. Civ. Code § 2924 ............................................................................8, 13

Cal. Civ. Code § 2925-29241 ...................................................................... 13

# RULES

Fed. R. Civ. P. 9(b) ...........................................................................11, 13, 14

# REGULATIONS

12 C.F.R. § 560.2(a) ...................................................................................... 4

12 C.F.R. § 560.2(b) ...................................................................................... 6

12 C.F.R. § 560.2(b)(4) ...........................................................................7, 8, 9

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

12 C.F.R. § 560.2(b)(5) ...................................................................................... 7, 8, 9

12 C.F.R. § 560.2(b)(9) ...................................................................................... 7, 8, 9

12 C.F.R. § 560.2(b)(10) .................................................................................... 7, 8, 9

61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996)......................................................... 6

**OTHER AUTHORITIES**

9 Witkin, *Sum. Cal. Law,* Corp. § 198 (10th ed. 2005)........................................... 5

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.   INTRODUCTION

This is an action brought by the borrowers against their lender, Wells Fargo Bank, N.A. (as successor to World Savings Bank, FSB ("World Savings")) ("Wells Fargo"), arising out of a 2005 secured residential loan.  Although plaintiffs experienced financial hardships and were unable to make the loan payments, they seek to prevent Wells Fargo from proceeding with foreclosure.  Wells Fargo filed a motion to dismiss all claims for relief in the Complaint, which was heard on January 27, 2014.  Indeed, after thoroughly reviewing and considering all of the papers submitted by the parties, and hearing oral argument, this Court issued a 19-page Order granting the motion with prejudice as to the claims for violation of Civil Code § 2923.6 and demand for accounting and with 30-days limited leave to amend as to the remaining two claims for negligence and violation of Business and Professions Code § 17200.  (*See* Minute Order, Doc. No. 22 – For convenience the Minute Order is attached to the Request for Judicial Notice as Exhibit H).

Plaintiffs filed the First Amended Complaint ("FAC") on February 27, 2014.  However, the FAC is almost identical to the original Complaint, except that plaintiffs omitted the claims that were dismissed with prejudice.  Despite the Court's Order and admonishments, plaintiffs continue to assert the allegations this Court previously determined were preempted by Federal Law and/or failed to state a viable claim against Wells Fargo.  The FAC does nothing to cure the defects identified by this Court.  Since this Court has already considered plaintiffs' allegations and claims and determined that they fail to state viable claims for relief, Wells Fargo respectfully requests that the Court grant its motion to dismiss the FAC, in its entirety, without leave to amend.

/ / /

/ / /

/ / /

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

## 2. SUMMARY OF THE FAC AND JUDICIALLY NOTICEABLE DOCUMENTS

The general factual allegations remain primarily the same as in the Original Complaint.  On or about January 3, 2005, plaintiffs James T. Williams and Stephanie Williams obtained a refinance loan of $456,000.00 from World Savings Bank, FSB ("World Savings"), secured by real property located at 1015 Nighthawk Circle, Corona, CA 92881 (the "Property").  (FAC ¶¶1, 11 and Exhibit A thereto; RJN Exhs. A & B – Note & Deed of Trust, respectively).[1]  Plaintiffs allege that in 2011, they suffered a significant financial setback and they struggled to make the loan payments and exhausted their savings.  (FAC ¶14).  In May 2011, they were no longer able to make the payments and thereafter remained consistently one month behind.  (FAC ¶15).

Plaintiffs further allege that in or around August 2011, they contacted Wachovia Mortgage to inquire about a loan modification and ultimately applied for a loan modification and submitted a completed application via facsimile.  (FAC ¶¶16-18).  Plaintiffs allege that on or about December 12, 2011, while the application was still in review, a Notice of Default was executed and recorded.  (FAC ¶22; RJN Exh. D).  Plaintiffs allege that they immediately contacted the bank and were told that their application had been denied, and their only option was to reapply for a loan modification.  (FAC ¶23).  Plaintiffs allege that they submitted a new and complete application, and a phone interview, but were told in just a few days that their application was denied because there was no material change in their financial circumstances.  (FAC ¶¶24-27).  Plaintiffs allege that they challenged this decision and submitted documentation showing a

---

[1] Effective January 1, 2008, World Savings was renamed Wachovia Mortgage, FSB.  In November 2009, Wachovia Mortgage, FSB changed its name to Wells Fargo Bank Southwest, N.A., before merging into Wells Fargo Bank, N.A. (hereinafter collectively, "Wells Fargo").  (RJN Exh. C).

decrease in their income from $16,000 per month.  Soon thereafter, plaintiffs were informed that their request was denied due to the fact that there was no change in their financial circumstances.  (FAC ¶¶28-30).

On or about March 12, 2012, a Notice of Trustee's Sale was executed and recorded.  (FAC ¶32; RJN Exh. E).  Plaintiffs then filed a Chapter 7 Bankruptcy petition on April 2, 2012, which was converted to a Chapter 13 in June 2012.  Plaintiffs allege that on August 24, 2012, the Chapter 13 Bankruptcy was dismissed because they could not afford the plan payments.  (FAC ¶¶33-35; RJN Exh. F – Bankruptcy Order of Dismissal).  On August 31, 2012, plaintiffs filed a second Chapter 13 Bankruptcy and the plan was confirmed on October 23, 2012.  According to plaintiffs, they made the plan payments and approximately $13,000 was disbursed to Wells Fargo and their 2nd mortgage with JPMorgan Chase Bank was forgiven.

Plaintiffs allege that in December 2012, they contacted Wells Fargo regarding a loan modification based on their change in financial circumstances, but were never able to speak with anyone who could assist them.  In or around March 2013, plaintiffs were advised that the sale date was cancelled due to the pending Bankruptcy.  On or about July 11, 2013, plaintiffs' Bankruptcy was dismissed.  (FAC ¶¶36-41; RJN Exh. G – Bankruptcy Notice of Dismissal).  Plaintiffs allege that they tried to discuss a loan modification application with numerous Wells Fargo representatives but none of them were able to provide them with any assistance.  (FAC ¶43).  Plaintiffs further allege that Wells Fargo systematically charges undisclosed marked-up fees for default related services, which prevented them from curing the default.  (FAC ¶¶45).  Plaintiffs allege that they are in possession of the Property and no Trustee's sale has occurred, but fear Wells Fargo will re-notice the sale.  (FAC ¶44).

Based on these allegations and others, plaintiffs assert claims for relief for: (1) negligence and (2) violation of Business & Professions Code § 17200.

Anglin Flewelling Rasmussen Campbell & Trytten llp

3. **PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY HOLA**

**A.   As A Federal Savings Bank, World Savings Operated Under HOLA.**

Plaintiffs obtained the loan from World Savings in January 2005.  (FAC ¶11; RJN Exhs. A, B).  At that time, World Savings was a federally chartered savings association regulated by the Office of Thrift Supervision ("OTS") (attached to the RJN as Exhibit C is a copy of a letter from the OTS identifying World Savings Bank, FSB, known later as Wachovia Mortgage, FSB, as a federal savings bank).  As a federal savings bank, World Savings was organized and operated under HOLA.  12 U.S.C. § 1461, *et seq*.  (RJN Exh. C - Section 4 of Wachovia's Charter).

**B.   Case Law Confirms The Post-Merger Application Of HOLA.**

As this Court held, HOLA still applies even though World Savings was ultimately merged into Wells Fargo Bank, N.A.  (RJN Exh. H – Minute Order, p. 15).  First, the Note and Deed of Trust are governed by the federal regulations that apply to a federally chartered savings institution:

> **15. GOVERNING LAW; SEVERABILITY.  This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions ("Federal Law")** (emphasis in original)

(RJN Exh. B (Deed of Trust) at ¶15; RJN Exh. A (Note) at ¶12).  And the "federal rules and regulations…for federally chartered savings institutions…" include HOLA and its regulations.  12 C.F.R. § 560.2(a).

Second, plaintiffs and Wells Fargo also agreed that "Lender's rights" under the Deed of Trust survive a merger:

> Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.  (RJN Exh. B (Deed of Trust) at ¶ 1).

"Lender" is defined in the Deed of Trust as: "WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES.  Lender is a FEDERAL SAVINGS

BANK, which is organized and exists under the laws of the United States." (RJN Exh. B (Deed of Trust) at ¶1(c)) (emphasis in original). The Note expands that definition, adding: "or anyone to whom this Note is transferred." (RJN Exh. A (Note) at ¶1). Plaintiffs and Wells Fargo therefore agreed that "all" "rights" of the "Lender", a federal savings bank, shall be transferred to anyone "who takes over Lender's rights".

Third, the federal regulations governing the merger of a federal savings association into a national bank provide:

> (2) Consolidations and mergers with Federal savings associations under 12 U.S.C. 215c resulting in a national bank…(A) A national bank entering into the consolidation or merger shall follow the procedures of 12 U.S.C. 215 or 215a, respectively, as if the Federal savings association were a state or national bank. 12 C.F.R. § 5.33(g).

Under both 12 USC §§ 215(e) and 215a (e) Congress specified that:

> All rights, franchises, and interests of the individual merging banks or banking associations in and to every type of property (real, personal, and mixed) and choses in action shall be transferred to and vested in the receiving association by virtue of such merger without any deed or other transfer.

California law confirms that the surviving entity in a merger "succeeds to the rights, property, debts, and liabilities, without other transfer." 9 Witkin, Sum. Cal. Law, Corp. (10th ed. 2005) § 198 p. 968; *Maudlin v. Pacific Decision Sciences Corp.,* 137 Cal. App. 4th 1001, 1009-10 (2006) (contract rights of acquired entity are unchanged by merger); *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1238 (1st Cir. 1996) ("it is hornbook law that the assignee of a mortgage succeeds to all of the assignor's rights, power and equities").

The post-merger application of HOLA was recently recognized by the California Court of Appeal in *Akopyan v. Wells Fargo Home Mortg., Inc.*, 215 Cal. App. 4th 120, 143 (2013), where the Court found that "the OTS intended to occupy the field of lending regulation as to both federal thrifts and their loans." The

*Akopyan* Court noted:

> [T]he OTS extended preemption to federally originated loans sold or assigned to investors not entitled to preemption on the principle that "loan terms should not change simply because an originator entitled to federal preemption may sell or assign a loan to an investor that is not entitled to federal preemption." (OTS, Opn. Letter No. P-2003-5 (July 22, 2003) p. 7, fn. 18.) Its rationale was that state law "might interfere with the ability of federal savings associations to sell mortgages that they originate under a uniform federal system."

*Id.* at 148.  This rule is reflected in numerous District Court decisions on HOLA. *See, e.g., DeLeon v. Wells Fargo Bank, N.A.*, 729 F. Supp. 2d 1119, 1126 (N.D. Cal. 2010) ("Wells Fargo notes that at the time the loan was made to the DeLeons [plaintiffs], World Savings Bank, FSB was a federally chartered savings bank organized and operating under HOLA and observes correctly that the same preemption analysis would apply to any alleged misconduct after November 1, 2009, when the lender merged into a national savings banking association."); *Babb v. Wachovia Mortg., FSB*, 2013 U.S. Dist. LEXIS 106228, at *12-*13 (C.D. Cal. July 26, 2013) ("In this case, Plaintiffs contracted with a Federal Savings Bank. Further, the parties agreed to be bound by such laws  under the terms of the trust deed.  Thus, HOLA preemption applies in this case").

## C.  OTS Regulations Promulgated Under HOLA Preempt Any State Laws Which Affect Loan Origination, Disclosures, And Lending Regulation.

OTS regulations issued pursuant to HOLA are "intended to preempt all state laws purporting to regulate any aspect of the lending operations of a federally chartered savings association, whether or not OTS has adopted a regulation governing the precise subject of the state provision." *Lopez v. World Savings & Loan Ass'n*, 105 Cal. App. 4th 729, 738 (2003).

Preemption analysis under HOLA is simple, as the OTS Final Rule, 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996) instructs.  Step one determines whether the type of state law at issue appears on the list set forth in 12 C.F.R. § 560.2(b).  That regulation lists the types of state laws that HOLA preempts.  If the type of state law

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

in question appears on the list, the analysis ends there and the law is preempted. There is no step two.  As the Ninth Circuit observed in *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1004-05 (9th Cir. 2008), the OTS's construction of its own regulation 560.2 "must be given controlling weight" and any presumption against preemption of state law does not apply to HOLA.  Any doubt should be resolved in favor of preemption.  *Weiss v. Washington Mutual Bank*, 147 Cal. App. 4th 72, 76-77 (2007).

**D.   State Laws Preempted By HOLA.**

Among the regulations that are "so pervasive as to leave no room for state regulatory control" are OTS regulations 560.2(b)(4), (5), (9) and (10).  These regulations preempt state laws that "would impose requirements on federal savings banks regarding":

> **(b)(4)   The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due**, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan; 12 C.F.R. § 560.2(b)(4)

> **(b)(5) Loan-related fees, including without limitations, initial charges, late charges, prepayment penalties, servicing fees**, and overlimit fees; 12 C.F.R. § 560.2(b)(5)

> **(b)(9)  Disclosure and advertising**, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants; 12 C.F.R. § 560.2(b)(9)

> **(b)(10) Processing, origination, servicing**, sale or purchase of, or investment or participation in…**mortgages**; 12 C.F.R. § 560.2(b)(10)

**E.   Plaintiffs' State Law Claims Are Preempted By HOLA.**

Plaintiffs' state law claims for negligence and violation of Business & Professions Code § 17200 still challenge the servicing of plaintiffs' loan, the handling of their request for a loan modification, and the alleged assessment of loan-related fees.  (FAC ¶¶14-54, 55-59, 62, 63, 64, 66-67, 70, 75, 77, 78, 81, 82,

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

85).  Plaintiffs' allegations challenge preempted areas including the terms of credit, loan-related fees, disclosures, and the processing and servicing of mortgages.  12 C.F.R. § 560.2(b) (4), (5), (9), (10).

Well-established case law confirms that such claims against Wells Fargo are preempted.  In *Kaplan v. Wells Fargo Bank, N.A.,* 2013 U.S. Dist. LEXIS 109023, at *8-*9 (C.D. Cal. July 30, 2013), the Court held similar claims for fraudulent misrepresentation, promissory estoppel, negligent misrepresentation, and violation of the Homeowner Bill of Rights ("HBOR") were preempted by HOLA.  *See also Isabel Mata v. Wells Fargo Bank, N.A.,* 2013 U.S. Dist. LEXIS 108197, at *7-*18 (C.D. Cal. July 31, 2013) (Court held claims for violation of Civil Code section 2923.5, breach of the implied covenant of good faith and fair dealing, negligence, and violation of Business & Professions Code section 17200 arising out of a loan modification review were preempted by HOLA); *Ismail v. Wells Fargo Bank, N.A.,* 2013 U.S. Dist. LEXIS 32594, at *25-*26 (E.D. Cal. Mar. 8, 2013) ("California Civil Code sections 2924 and 2923.5 regulate Defendant's ability to participate and service its mortgages.  Additionally, Plaintiffs' UCL claim is predicated on Plaintiffs' claim that Defendant violated California Civil Code section 2923.5. Because these claims are based on misconduct relating to foreclosure proceedings, they are governed by HOLA and thus preempted.  As such, these claims are also dismissed on the ground that they are preempted.").

In *Sharma v. Wachovia*, 2011 U.S. Dist. LEXIS 1736 (E.D. Cal. Jan. 6, 2011), the plaintiff alleged various state law causes of action against Wachovia Mortgage arising out of, among other things, "Defendant['s] refus[al] to modify the loan."  *Id.* at *2.  Concerning HOLA preemption, the Court ruled: "All four claims are preempted by HOLA.  Each cause of action is based upon allegations pertaining to 'terms of credit', 12 C.F.R. § 560.2(b)(4), and 'processing, origination and servicing, of mortgages,'  12 C.F.R. § 560.2(b)(10).  Because all of Plaintiff's state claims involve types of law listed in paragraph 560.2(b), all of

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1    Plaintiff's claims are preempted by HOLA and must be dismissed." *Id*. at *6.

2        Moreover, as this Court held, the claims concerning foreclosure related fees

3    and their disclosure fall squarely within C.F.R. § 560.2(b)(5) & (9).  (RJN Exh. H

4    – Minute Order, p. 17).  In *Weiss,* the Court of Appeal held that HOLA preempted

5    a borrower's claim against a lender for fraud and unfair business practices arising

6    out of the lender's alleged non-disclosure of a prepayment penalty provision.  *Id*. at

7    75-76 (claim would impose requirements on the lender as to "loan-related fees"

8    and therefore, fell within § 560.2(b)(5), which lists such laws as preempted). *See*

9    *Gomez v. Wachovia Mortg. Corp.*, 2010 U.S. Dist. LEXIS 3799, at *7-*8 (N.D.

10   Cal. Jan. 15, 2010) (court held that a claim alleging a failure to disclose a loan-

11   related fee, i.e. a yield spread premium, was

12   preempted by HOLA).

13       Similarly, here, plaintiffs' claims touch upon the bank's lending practices in

14   the areas of terms of credit, loan-related fees, loan disclosures, and processing and

15   servicing of mortgages.  12 C.F.R. §§ 560.2(b) (4), (9), (10).  As such, the first and

16   second claims for relief are preempted by HOLA and should be dismissed without

17   leave to amend.

18       In addition to being preempted by HOLA, plaintiffs' claims for negligence

19   and violation of Business & Professions Code § 17200 fail to state viable claims

20   for relief.

21            **4.    PLAINTIFFS CANNOT STATE A VIABLE CLAIM FOR**

22                                   **NEGLIGENCE**

23       Plaintiffs fail to cure the defects identified by this Court in the claim for

24   negligence.  The negligence claim in the FAC is essentially identical to the original

25   Complaint, except it is now the first cause of action instead of the second cause of

26   action.  (Cf FAC ¶¶55-69; Comp. ¶¶100-114).  Plaintiffs did not add any factual

27   allegations to the FAC, including the claim for negligence.  Plaintiffs continue to

28   allege that Wells Fargo "acting as Plaintiffs' lender, mortgage servicer and

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1    beneficiary to Plaintiffs' loan, had a reasonable duty to exercise reasonable care

2    and skill" with respect to the loan documents, the status of the foreclosure actions,

3    and the loan modification.  (FAC ¶56; Comp. ¶101).  Additionally, plaintiffs

4    continue to allege that Wells Fargo breached its duty by making promises that

5    would not be honored, sending plaintiffs false and misleading advertisements

6    regarding the availability of options to save their home, and failing to sufficiently

7    train loss mitigation staff.  (FAC ¶63; Comp. ¶108).  Since this Court already ruled

8    this claim fails to state a viable claim for relief, and plaintiffs did not add any other

9    allegations, the negligence claim should be dismissed without further leave to

10   amend.  (*See* RJN Exh. H - Minute Order, pp. 9-11).  Moreover, this Court held

11   that "any claim regarding the procedures used by Wells Fargo in servicing

12   Plaintiffs' loan or handling their application for a loan modification are

13   preempted."  (*See* RJN Exh. H - Minute Order, pp. 17-18).  Thus, plaintiffs'

14   negligence claim is also preempted by HOLA.

15       "The determination of whether a duty exists is primarily a question of law."

16   *Eddy v. Sharp*, 199 Cal. App. 3d 858, 864 (1988).  "[A]bsent a duty, the

17   defendant's care, or lack of care, is irrelevant."  *Software Design and Application*

18   *Ltd. v. Hoeffer & Arnolt Inc.*, 49 Cal. App. 4th 472, 481 (1996).  In *Nymark v.*

19   *Heart Fed. Savs. & Loan Ass'n*, the court held: "[A]s a general rule, a financial

20   institution owes no duty of care to a borrower when the institution's involvement

21   in the loan transaction does not exceed the scope of its conventional role as a mere

22   lender of money."  231 Cal. App. 3d 1089, 1096 (1991).  Indeed, "[l]iability to a

23   borrower for negligence arises only when the lender 'actively participates' in the

24   financed enterprise 'beyond the domain of the usual money lender.'"  *Id*.  A

25   plaintiff's "inability to plead a duty of care . . . precludes his maintenance of a

26   cause of action on any negligence theory."  *LiMandri v. Judkins*, 52 Cal. App. 4th

27   326, 349 (1997).

28       Here, this Court previously held that Wells Fargo owed no duty of care to

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  plaintiffs.  (*See* RJN Exh. H - Minute Order, pp. 9-11).  In *Lueras v. BAC Home*
2  *Loans Servicing, LP*, 221 Cal. App. 4th 49, 67-68 (2013), the California Court of
3  Appeal held: "We conclude a loan modification is the renegotiation of loan terms,
4  which falls squarely within the scope of a lending institution's conventional role as
5  a lender of money.…  The *Biakanja* factors do not support imposition of a
6  common law duty to offer or approve a loan modification…[or] a duty of care to
7  handle [a borrower's] loan in such a way to prevent foreclosure and forfeiture of
8  his property.".  Since plaintiffs did not add any allegations to the FAC, there is no
9  basis to find a duty of care was owed to plaintiffs.  Thus, plaintiffs cannot establish
10  a duty of care owed to them and the negligence claim fails.

11       Furthermore, as this Court previously noted, plaintiffs fail to plead any facts
12  satisfying the particularity required under Rule 9(b) for any claim based on alleged
13  misrepresentations.  (*See* RJN Exh. H – Minute Order, p. 10, n.1).

14       Finally, this claim is defective because it does not plead any legally
15  cognizable damages caused by the alleged breach.  (FAC ¶64).  Indeed, plaintiffs
16  have no right to a loan modification under any codified laws.  *See Mabry v.*
17  *Superior Court*, 185 Cal. App. 4th 208, 222-223, 231 (June 2, 2010) (holding that
18  there is no right to a loan modification under Civil Code §§ 2923.5 or 2923.6; "As
19  mentioned above, there is no right, for example, under [Civil Code Section
20  2923.5], to a loan modification."); *Hoffman v. Bank of America, N.A.*, 2010 U.S.
21  Dist. LEXIS 70455, at *15 (N.D. Cal., June 30, 2010) ("lenders are not required to
22  make loan modifications for borrowers that qualify under HAMP nor does the
23  servicer's agreement confer an enforceable right on the borrower"); *Villa v. Wells*
24  *Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 23741, at *6-*7 (S.D. Cal., Mar. 15,
25  2010) ("[T]he HAMP agreement did not require loan servicers to modify eligible
26  loans; thus, the court found borrowers lacked standing to enforce the agreement.").
27  Even HBOR does not require lenders to grant loan modifications.  Civ. Code
28  § 2923.4 (while "borrowers are considered for, and have a meaningful opportunity

1   to obtain, available loss mitigation options, if any…[n]othing in the act…shall be

2   interpreted to require a particular result of that process.").  Here, in the most basic

3   terms, plaintiffs borrowed money from Wells Fargo and failed to satisfy their

4   contractual obligation to repay the loan, which resulted in their alleged damages.

5        For all of these reasons, the first claim for relief for negligence should be

6   dismissed without leave to amend.

7        5.   **PLAINTIFFS FAIL TO STATE A CLAIM UNDER BUSINESS &**

8            **PROFESSIONS CODE § 17200**

9        The claim for violation of Business & Professions Code § 17200 in the FAC

10  is identical to the original Complaint, except plaintiffs omit the specific allegations

11  relating to HBOR.  (Cf. FAC ¶¶75, 70-88; Comp. ¶¶120, 115135).  Since the Court

12  dismissed this claim with leave to amend and plaintiffs failed to add any

13  allegations to amend this claim, the second claim for relief should be dismissed

14  without leave to amend.

15  **A.   Plaintiffs Have Not Alleged A Violation Of § 17200.**

16       A claim under Business and Professions Code § 17200 (the "UCL") must

17  state with reasonable particularity the facts supporting the elements of the alleged

18  violation.  *Khoury v. Maly's, Inc.*, 14 Cal. App. 4th 612, 619 (1993).  It requires an

19  allegation of particular facts showing ongoing unlawful, unfair, and fraudulent

20  business acts on the part of the defendant.  *Korea Supply Co. v. Lockheed Martin*

21  *Corp.*, 29 Cal. 4th 1134, 1143 (2003); *Khoury*, 14 Cal. App. 4th at 619; *Nguyen v.*

22  *Wells Fargo Bank, N.A.*, 749 F. Supp. 2d 1022, 1037 (N.D. Cal. 2010) ("this cause

23  of action is derivative of some other illegal conduct or fraud committed by a

24  defendant, and a plaintiff must state with reasonable particularity the facts

25  supporting the statutory elements of the violation").

26       The "unlawful" prong borrows statutory or constitutional claims from

27  elsewhere.  *Melegrito v. CitiMortgage Inc.*, 2011 U.S. Dist. LEXIS 60447, at *24

28  (N.D. Cal. June 6, 2011).  "A defendant cannot be liable under § 17200 for

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

committing 'unlawful business practices' without having violated another law." *Ingels v. Westwood One Broadcasting Services, Inc*., 129 Cal. App. 4th 1050, 1060 (2005) (citations omitted). The "unfair" prong applies when the practice at issue allegedly violates "the policy or spirit of [anti-trust] laws because its effects are comparable to a violation of the law, or that otherwise significantly threatens or harms competition." *Cel-Tech Comm'cns, Inc., v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). The "fraudulent" prong, post-enactment of Proposition 64, applies where a business act or practice actually misleads a plaintiff. See *Hall v. Time, Inc.*, 158 Cal. App. 4th 847, 849 (2008). It must be shown that members of the public "are likely to be deceived." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839 (1994). Further, a plaintiff "must plead a claim for fraudulent behavior under the UCL with particularity as required by Rule 9(b)." *Martinez v. Welk Group, Inc.*, 2011 U.S. Dist. LEXIS 58718, at *22 (S.D. Cal. June 2, 2011) (citing *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1124 (9th Cir. 2009)). Even a cursory review of the FAC in this case reveals that none of the foregoing requisites has been met.

Plaintiffs do not allege any violation of § 17200 by Wells Fargo. Indeed, plaintiffs predicate their § 17200 claim on the same allegations supporting the negligence claim for relief. (FAC ¶¶70, 75-78). However, as discussed above, and in this Court's prior Minute Order, plaintiffs cannot state any viable claims against Wells Fargo based on such allegations. (*See* RJN Exh. H – Minute Order, pp. 12-13). Therefore, such claims cannot provide a basis for the § 17200 claim. *Ingels*, 129 Cal. App. 4th at 1060 ("A defendant cannot be liable under § 17200 for committing unlawful business practices without having violated another law"); *Cerecedes v. U.S. Bancorp*, 2011 U.S. Dist. LEXIS 75559, at *15-*17 (C.D. Cal. July 11, 2011) (Section 17200 claim dismissed where plaintiffs failed to allege a viable independent claim for violations of California's non-judicial foreclosure scheme, Civ. Code §§ 2923.5, 2924-29241); *Slipak v. Bank of Am., N.A.*, 2011 U.S.

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

Dist. LEXIS 131079, at *11-*12 (E.D. Cal. Nov. 10, 2011) (Where UCL claim "is premised upon the same acts alleged in the other claims in his complaint, all of which fail to state a claim…Plaintiff's section 17200 claim is dismissed" because "Plaintiff has not adequately alleged any predicate unlawful, unfair, or fraudulent acts.").

Moreover, despite this Court's ruling that these "barebones allegations are insufficient", plaintiffs continue to assert the conclusory allegations that defendants' acts and practices are unlawful because they violate 18 U.S.C. §§ 1341 and 1343, which are criminal statues covering fraud and mail fraud; 18 U.S.C. § 1962, the RICO statute, and various state law statutes dealing with deceit.  (Cf. FAC ¶79; Comp. ¶126; *see* RJN Exh. H – Minute Order, p. 12).  The allegations of fraud and mail or wire fraud are subject to the specificity requirements of Rule 9(b), particularly where asserted in connection with a claim of racketeering activity.  *Edwards v. Marin Park, Inc*., 356 F.3d 1058, 1065-66 (9th Cir. 2004); *Murr Plumbing, Inc. v. Scherer Bros. Fin. Serv. Co*., 48 F.3d 1066, 1069 (8th Cir. 1995) ("The particularity requirements of Rule 9(b) apply to allegations of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, when used as predicate acts for a RICO claim"); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400-1401 (9th Cir. 1986).  Since plaintiffs failed to amend the Complaint to allege any facts that would constitute a violation of any of the federal or state laws, no claim for an unlawful practice has been stated on those grounds. (*See* RJN Exh. H – Minute Order, p. 12).

Further, as discussed above, plaintiffs' claim is preempted by HOLA. Indeed, this Court ruled that the UCL claim is preempted to the extent it relies on "the assessment of allegedly excessive fees" or "the procedures used by Wells Fargo in servicing Plaintiffs' loan or handling their application for a loan modification."  (*See* RJN Exh. H – Minute Order, pp. 17-18).  Plaintiffs' UCL claim still relies on these allegations, and is therefore preempted. (FAC ¶¶75a., d.,

1    e., g., 77, 78, 81-82; Comp. ¶¶120b., g., h., k., 124, 125, 128-129).  Indeed, a UCL

2    claim "cannot be used to state a cause of action the gist of which is absolutely

3    barred under some other principle of law."  *Stop Youth Addiction, Inc. v. Lucky*

4    *Stores, Inc.*, 17 Cal. 4th 553, 566 (1998).

5        As no predicate act can be raised, and plaintiffs failed to amend the

6    Complaint to add any factual allegations, the second claim for relief should be

7    dismissed without leave to amend.

8    **B.**     **Plaintiffs Also Lack Standing To Allege A UCL Claim.**

9        In order to have standing to sue under the UCL, "A private plaintiff must

10    make a twofold showing: he or she must demonstrate injury in fact and a loss of

11    money or property caused by unfair competition."  *Peterson v. Cellco P'ship*, 164

12    Cal. App. 4th 1583, 1590 (2008); *see also Daro v. Superior Court*, 151 Cal. App.

13    4th 1079, 1098 (2007) ("Thus, a private person has no standing under the UCL

14    unless that person can establish that the injury suffered and the loss of property or

15    money resulted from conduct that fits within one of the categories of 'unfair

16    competition' in section 17200.").

17        Here, plaintiffs have not alleged an injury in fact, nor can they allege that

18    they lost money or property as a result of any conduct of Wells Fargo in violation

19    of § 17200.  In a similar situation, the Court in *DeLeon v. Wells Fargo Bank, N.A.*,

20    2011 U.S. Dist. LEXIS 8296 (N.D. Cal. 2011), held that the borrowers did not state

21    a claim for violation of UCL:

22          The Court cannot reasonably infer that Wells Fargo's alleged
           misrepresentations resulted in the loss of Plaintiffs' home.

23          Rather, the facts alleged suggest that Plaintiffs lost their home
           because they became unable to keep up with monthly payments

24          and lacked the financial resources to cure the default. Although
           the Court understands Plaintiffs' frustrations with Wells Fargo's

25          seemingly contradictory statements and actions, it does not
           appear that this conduct resulted in a loss of money or property.

26

27    *Id*. at \*19-\*22.  Similarly, in *Hamilton v. Greenwich Investors XXVI, LLC*, 195

28    Cal. App. 4th 1602 (2011), the Court of Appeal rejected the plaintiffs' attempt to

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  state a § 17200 claim based on an alleged violation of former Civil Code § 2923.5

2  and stated:

> Plaintiffs assert they could amend their complaint to state a cause of action for unfair competition under Business and Professions Code section 17200 (forbidding unlawful, unfair or fraudulent business practices), based on Greenwich Investors' alleged violations of Civil Code section 2923.5. **But plaintiffs cannot properly allege they lost money or property "as a result of" defendants' alleged violation of section 2923.5** (Bus. & Prof. Code, § 17204) for the same reasons already discussed. **Plaintiffs' only right to relief under the statute was postponement of the foreclosure sale, and lenders are not required to take any action under the statute. (*Mabry, supra*, 185 Cal.App.4th at pp. 214, 222–223.)**

10  *Id.* at 1616-17 (emphasis added).

11      Indeed, here, plaintiffs have no actual loss because they borrowed money

12  from Wells Fargo and did not repay the loan.  Thus, any possible future loss will

13  be the "result of" plaintiffs' failure to make their loan payments.  Hence, plaintiffs

14  lack standing to bring this claim.  Accordingly, the second claim for relief should

15  be dismissed without leave to amend.

16              **6.   CONCLUSION**

17      For the foregoing reasons, Wells Fargo respectfully requests an order

18  dismissing the first and second claims for relief without leave to amend, and

19  dismissing the FAC with prejudice.

20                          Respectfully submitted,

21  Dated: March 13, 2014          ANGLIN, FLEWELLING, RASMUSSEN,
                                    CAMPBELL & TRYTTEN LLP
22

23                          By:   ___*/s/ Lynette Gridiron Winston*___
24                              Lynette Gridiron Winston
                                lwinston@afrct.com
25                          Attorneys for Defendant
                            WELLS FARGO BANK, N.A.

26

27

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

# EXHIBIT A

Joseph R. Manning, Jr., Esq. (State Bar No. 223381)
**THE LAW OFFICES OF JOSEPH R. MANNING, JR.**
**A PROFESSIONAL CORPORATION**
4667 MacArthur Blvd., Suite 150
Newport Beach, CA 92660
(949) 200-8755 Phone
(866) 843-8308 Fax

Attorneys for Plaintiffs JAMES WILLIAMS AND STEPHANIE WILLIAMS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES T. WILLIAMS AND STEPHANIE WILLIAMS,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A., a business entity form unknown, and NDEX WEST, LLC, a business entity form unknown, and DOES 1-100, inclusive,<br><br>Defendants. | **Case No.:** EDCV 13-02075 JVS (DTBx)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF:**<br><br>1. **NEGLIGENCE**<br>2. **VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §17200**<br><br>**Complaint filed:** October 11, 2013<br>**Date Removed:** November 12, 2013 |

TO WELLS FARGO BANK, N.A. and NDEX WEST, LLC, and to their

respective counsel of record:

Plaintiffs JAMES T. WILLIAMS and STEPHANIE WILLIAMS (hereinafter

collectively referred to as "Plaintiffs"), by their attorney, for causes of action against

Defendants WELLS FARGO BANK, N.A., a business entity form unknown, NDEX

WEST, LLC, a business entity form unknown, and DOES 1 through 100, inclusive (hereinafter collectively referred to as "Defendants"), allege the following on information and belief:

## I.

## INTRODUCTION

1. Plaintiffs own the subject property located at **1015 Nighthawk Circle, Corona, CA 92881** (the "Subject Property").

2. Plaintiffs bring this action against Defendants and DOES 1 to 100 to challenge the wrongful foreclosure proceedings on Plaintiffs' home, and based on the following:

   a. Defendants' negligence in Defendants' affirmative misrepresentations made to Plaintiffs regarding Plaintiffs' account and foreclosure activity relating to the Subject Property; and

   b. Defendants' violations of California Business & Professions Code §17200 by engaging in unlawful, unfair and/or fraudulent business practices as part and parcel to unsafe and unsound banking procedures; and

## II.

## PARTIES

3. At all times mentioned herein, Plaintiffs JAMES T. WILLIAMS AND STEPHANIE WILLIAMS are individuals who reside in the County of Riverside, State of California. Plaintiffs currently reside in their home, the Subject Property. Plaintiffs are the rightful owners of the Subject Property.

4. Upon information and belief, Defendant WELLS FARGO BANK, N.A. ("Wells Fargo"), is a business organization of unknown form doing business in the County of Riverside, State of California.

5. Upon information and belief, Defendant NDEX WEST, LLC ("NDEX West"), is a business organization of unknown form doing business in the County of Riverside, State of California.

6. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1-100, inclusive, and therefore, sue these Defendants by such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to allege their true names and capacities when they have been ascertained.

7. Plaintiffs are informed and believe, and based thereon, allege that at all times mentioned in this complaint Defendants were the agents, servants, representatives, partners and/or employees of co-Defendants, and, by engaging in the actions mentioned below, were, unless otherwise alleged, acting within the course and scope of their authority as such agent, servant, representative, partner, and/or employee, with the permission and consent of co-Defendants.

8. Plaintiffs are informed and believe, and based thereon, allege that each of said Defendants is, in some manner, legally responsible for the unlawful actions, unlawful policies, and unlawful practices hereinafter alleged, and that Plaintiffs' damages were proximately caused by Defendants.  Plaintiffs will seek leave of Court to amend this Complaint to set forth the appropriate charging allegations along with the true names and capacities of said Defendants when they have been ascertained.

9. Any allegations about acts of any corporate or other business Defendants means that the corporation or other business did the alleged acts through its officers, directors, employees, agents, and/or representatives, while they were acting within the actual or ostensible scope of their authority.

# III.

# DEMAND FOR JURY TRIAL

10. Plaintiffs hereby respectfully request a trial by jury on all appropriate issues raised in this Complaint.

# IV.

# FACTUAL BACKGROUND

## The Loan

11. In 2005, Plaintiffs entered into a written loan agreement, and obtained a mortgage loan in the amount of $456,000 (the "Loan"), secured by the Subject Property through a Deed of Trust (recorded January 11, 2005), then and now the principal residence of Plaintiffs. A true and correct copy of the Deed of Trust is attached hereto and incorporated herein as **Exhibit A.**

12. Plaintiffs own the Subject Property at 1015 Nighthawk Circle, Corona, CA 92881. Plaintiffs' ownership is documented in a number of written instruments that are on file with the Riverside County's Recorder's Office, including a Grant Deed.

13. The Subject Property was and currently is the principal residence of Plaintiffs.

## Plaintiffs' Financial Struggle and Pursuit of Foreclosure Prevention Alternatives

14. Plaintiffs performed dutifully under the Loan, as required, until 2011 when Plaintiffs suffered a significant financial setback due to a downturn in the economy, and Plaintiffs were in a constant struggle to make the monthly mortgage payments. As a result, Plaintiffs were forced to use the money in their savings accounts to remain current on the Loan.

15. Plaintiffs were able to maintain making their monthly payments under the terms of the Loan; however, in or around May 2011, after having exhausted through their

savings, Plaintiffs were unable to make the monthly payment. From that point onwards, Plaintiffs were playing "catch-up" with their mortgage payments, but consistently remained only one (1) month behind on their payments.

16. In or around August 2011, Plaintiffs contacted their mortgage servicer at the time, Wachovia Mortgage, to inquire about a loan modification option. Wachovia Mortgage, through its authorized representative, advised Plaintiffs that they "qualified" for a loan modification, and promised Plaintiffs that if they submitted a loan modification application, then no foreclosure proceedings would initiate while their application was in review. However, the representative further advised Plaintiffs that Wachovia Mortgage would not assist them with their mortgage and review them for a loan modification if Plaintiffs continued to make any payments towards the mortgage. The representative advised Plaintiffs to stop making any payments under the Loan, and once the loan modification review was complete, Plaintiffs would either be approved or denied for a modification plan.

17. These representations led Plaintiffs to believe that they would qualify for a loan modification, that they would secure a new affordable monthly mortgage payment, and that they would retain the Subject Property.

18. Accordingly, Plaintiffs applied for a loan modification and submitted a completed modification application, along with all necessary paperwork, directly to Wachovia Mortgage, via facsimile. Moreover, Plaintiffs justifiably relied on Wachovia Mortgage's representations and stopped making any payments towards the mortgage.

19. Over the next couple of months, Plaintiffs consistently received letters from Wachovia Mortgage requesting financial documents, and as requested, Plaintiffs

continued to submit and resubmit updated financial documents and followed-up
weekly with Wachovia Mortgage, with the hope of securing a loan modification.
Plaintiffs were consistently assured that their documents had been received and
that their file was "in review."

20. However, in or around late October 2011, Plaintiffs received a letter from
Wachovia Mortgage, advising Plaintiffs that they had to pay a total amount of
approximately $15,000 to cure the default and bring the Loan current, or the Loan
would be referred to foreclosure.

21. Plaintiffs immediately contacted Wachovia Mortgage, and its representative
advised Plaintiffs that the letter did not impact the modification review process,
and that the Loan would still be considered for a modification. Plaintiffs
emphasized that they were now three (3) months behind on the Loan at Wachovia
Mortgage's direction and Wachovia Mortgage had yet to provide any meaningful
mortgage assistance as promised. The representative assured Plaintiffs that they
were being considered for all available modification programs and an affordable
modified payment was forthcoming.

22. However, on or around December 12, 2011, while Plaintiffs' application for a loan
modification was still "in review" for all available modification programs,
Defendants executed a Notice of Default and Election to Sell Under Deed of Trust
(the "NOD" or "Notice of Default"), against the Subject Property. A true and
correct copy of the Notice of Default is attached and incorporated hereto as
**Exhibit B**, recorded on December 13, 2011 in the Riverside County Recorder's
Office.

23. Immediately upon receiving the NOD, Plaintiffs contacted Defendant Wells

Fargo, as instructed in the NOD, and its representative informed Plaintiffs that their application for a loan modification had been denied, with no further explanation. The representative informed Plaintiffs that their only option was to re-apply for a loan modification and that if Plaintiffs re-applied, the NOD would be held "in suspense" while the review of Plaintiffs' application was pending.

24. As advised, Plaintiffs re-applied for a loan modification, and submitted a new and complete application directly to Defendant Wells Fargo, via facsimile.

25. Plaintiffs followed-up with Defendant Wells Fargo a few days after submitting their application to confirm receipt of their application, and Defendant Wells Fargo, through its representative, advised Plaintiffs that they needed to do a "phone interview" with Wells Fargo and "review financials." Once again, Plaintiffs followed Defendant's instructions, and proceeded with the financial review over the phone.

26. Once the representative finished the interview and advised Plaintiffs that he had obtained all the information needed for the modification review, the representative advised Plaintiffs that their application had been received and would be in "review."

27. However, just a few days after Plaintiffs submitted their application for a loan modification and completed the financial phone interview with Wells Fargo, Plaintiffs were informed that their application had been denied because there was no change in Plaintiffs' financial circumstances since Plaintiffs' previous application for a loan modification.

28. Plaintiffs immediately contacted Defendant Wells Fargo, and its representative advised Plaintiffs that their reported income of just below $16,000 per month was

too much to qualify Plaintiffs for a loan modification. Plaintiffs informed the representative that this income was incorrect, and in fact, Plaintiffs' income was much lower. The representative instructed Plaintiffs to submit supporting documents which showed this income, and Plaintiffs' application would be re-evaluated. Plaintiff justifiably relied on this representation and submitted the requested updated documents.

29. Plaintiffs actively followed up with Wells Fargo on the status of the review process and were always assured that they were being considered for all available modification programs and an affordable modified payment was forthcoming.

30. However, soon thereafter, Plaintiffs were again informed that their request for a loan modification had been denied due to the fact that there was no change in Plaintiffs' financial circumstances.

31. Plaintiffs immediately attempted to follow up with Defendant Wells Fargo regarding the denial; however, Plaintiffs were continuously directed to contact a different representative, as their assigned point of contact had changed. Plaintiffs were never connected with anyone at Wells Fargo who was willing to help them or provide any information on the denial.

32. Thereafter, on or around March 12, 2012, Defendants executed and recorded a Notice of Trustee Sale (the "NTS" or "Notice of Sale") against the Subject Property.

33. At this same time, Plaintiffs' minimal income could not support Plaintiffs' financial obligations and living expenses. In an effort to get back on their feet financially and ultimately retain their home, Plaintiffs filed for Chapter 7 Bankruptcy to relieve Plaintiffs of their personal unsecured debt obligations, on

April 2, 2012.

34. In or around June 2012, Plaintiffs converted their Bankruptcy to a Chapter 13 to reorganize their outstanding debt and obtain a repayment plan.

35. In or around August 2012, Plaintiffs received a payment plan from their Chapter 13 Bankruptcy, but Plaintiffs could not afford the payment amounts given. Plaintiffs' Bankruptcy was dismissed on August 24, 2012.

36. Plaintiffs immediately re-filed for Chapter 13 Bankruptcy, on August 31, 2012, to try to obtain a better reorganization plan to help them with their financial hardships. Plaintiffs obtained a confirmed Plan on October 23, 2012.

37. Thereafter, Plaintiffs made the required payments under the terms of the Reorganization Plan. Meanwhile, Plaintiffs' sale date on the Subject Property continued to be postponed month-to-month.

38. As a result of Plaintiffs' Bankruptcy, disbursements were made, and approximately $13,000 was disbursed to Wells Fargo as an outstanding secured payment. In addition, Plaintiffs' 2nd mortgage with JP Morgan Chase Bank, in the amount of $70,000, was forgiven.

39. As a result, in or around December 2012, Plaintiffs contacted Defendant Wells Fargo to attempt to obtain a loan modification based on the change in their financial circumstances. However, Plaintiffs kept getting transferred to different representatives and automated systems. Plaintiffs could not get in touch with anyone from Wells Fargo who was willing to provide Plaintiffs with any assistance.

40. Finally, in or around March 2013, Plaintiffs were advised that the sale date had been cancelled due to the pending Bankruptcy. Plaintiffs continued to try to call

Wells Fargo and seek mortgage assistance, and Plaintiffs were continuously unsuccessful.

41. On or around July 11, 2013, Plaintiffs' Bankruptcy was dismissed, and Plaintiffs once again, feared the imminent threat of foreclosure on their home.

42. At that point, Plaintiffs gross income was approximately $12,000 per month and Plaintiffs reasonably believed that they would qualify for a loan modification.

43. Plaintiffs attempted to contact Defendant Wells Fargo to discuss this significant decrease in their income (from the reported $16,000 previous income to the current $12,000 income); however, Plaintiffs were never able to speak to the same representative twice, and Plaintiffs were continuously transferred to voicemails and automated systems. Plaintiffs could not get any assistance from Wells Fargo. Plaintiffs never even received a telephone call back from anyone at Wells Fargo. The only correspondence Plaintiffs received was their monthly mortgage statement.

44. At this time, Plaintiffs are in possession of the Subject Property and no Trustee's sale has occurred. However, Defendants have recorded a Notice of Default and Plaintiffs reasonably believe that Defendants will soon re-notice/re-issue a Notice of Sale. As a result, the instant action became necessary.

45. As set forth herein, Plaintiffs have been unable to cure the default because of the substantial arrearages, which include unnecessary fees added to the loan balance, and Plaintiffs have been unable to negotiate a mortgage payment that they can afford. Thus, Plaintiffs have continued to fall behind on their mortgage payments, ultimately resulting in foreclosure proceedings and the possible eviction of Plaintiffs from their home.

46. Plaintiffs' claims are simple: when large financial institutions promise to modify eligible loans to prevent foreclosures and taxpaying homeowners live up to their end of the bargain, homeowners expect that promise to be kept, especially when those large financial institutions are acting under the guidance of a federal program specifically targeted at preventing foreclosures.

47. Unbeknownst to Plaintiffs, Defendants, acting as lenders, mortgage servicers, trustees, and/or beneficiaries, received, and continue to receive, a financial incentive on each loan modification application a borrower submits. Because of this type of incentive, Defendants benefit from allowing Plaintiffs' modification request to become stale and advising Plaintiffs to resubmit documents and/or re-apply for a modification, rather than actually reviewing Plaintiffs' application.

48. Defendant Wells Fargo wrongfully delayed Plaintiffs' modification requests due to its own ineffective and unreasonably slow processing systems, the financial incentives it received by asking Plaintiffs to submit multiple applications, and its failure to properly train its representatives to comply with Wells Fargo's obligations to borrowers under the law.

49. The foregoing acts and material omissions of the Defendants herein alleged were undertaken willfully, persistently, intentionally, knowingly, and/or in gross or reckless disregard of Plaintiffs' notice and disclosure rights.

50. Defendants, as employers of the authorized representatives who had contact with Plaintiffs, had advanced knowledge of the unfitness of the employee representatives and employed such representatives with a conscious disregard of the rights or safety of others, or authorized/ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.

51. Defendants are corporate employers. As such, their officers, directors, and/or managing agents had advanced knowledge of the willful and despicable conduct herein alleged and ratified the aforementioned acts of their authorized representatives and employees.

52. Plaintiffs **have been harmed** by Defendants' failure to provide accurate material disclosures and notices such that Plaintiffs can cure any alleged default and extinguish the transaction by operation of law.

53. Defendants are acting in concert to deprive Plaintiffs of their civil rights by attempting to take the Subject Property without due process of law.

54. Plaintiffs are ready, willing and able to enter into a loss mitigation program that is affordable for Plaintiffs and more profitable to Defendants than a foreclosure, and Plaintiffs are ready, willing and able to make such payments at the times required of them by law.

## V.

## FIRST CAUSE OF ACTION

## NEGLIGENCE

## (AS TO ALL DEFENDANTS)

55. Plaintiffs re-allege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

56. At all times relevant herein, Defendants, acting as Plaintiffs' lender, mortgage servicer and beneficiary to Plaintiffs' loan, had a reasonable duty to exercise reasonable care and skill to maintain proper and accurate loan records, and to discharge and fulfill the other incidents attendant to the maintenance, accounting and servicing of loan records, including, but not limited to:

a. Keeping an accurate accounting of Plaintiffs' mortgage payments, credits, and debits;

b. Disclosing to Plaintiffs the status of any foreclosure actions taken by Defendants;

c. Refraining from taking any action against Plaintiffs that they did not have the legal authority to do; and

d. Providing Plaintiffs with all relevant information regarding the Loan.

57. In addition, Defendant Wells Fargo assumed additional responsibilities when it dispatched letters advertising its mortgage assistance programs and undertook efforts to consider borrowers, including Plaintiffs, for loss mitigation options, including, but not limited to, loan modifications.

58. Those additional responsibilities include relaying accurate and timely information to borrowers about the status of their loan, the proper implementation of available foreclosure prevention alternatives and the provisions of the California Homeowner's Bill of Rights, so that Plaintiffs would be properly and fairly evaluated for a suitable foreclosure prevention alternative, including, but not limited to, a loan modification.

59. When Defendant Wells Fargo engaged in the servicing of Plaintiffs' Loan, its actions of assuming additional responsibilities in addition to reviewing Plaintiffs for a modification, were intended to affect Plaintiffs and their property because Plaintiffs was in direct contact and negotiation with Wells Fargo, Defendant Wells Fargo's representations were made directly to Plaintiffs, and those representations were likely to, and intended to, affect Plaintiffs' decision making with respect to their property.

60. Plaintiffs allege, on information and belief, that the harm to Plaintiffs was a foreseeable result of Defendants' negligence, given Defendants' numerous verbal promises, and Plaintiffs' justifiable reliance on those promises by foregoing alternative options to avoid foreclosure.

61. Had Plaintiff known that their home would be referred to foreclosure despite complying with the loan modification process, and despite Defendants' statements to them that they would receive a permanent modification and no foreclosure sale would occur, Plaintiffs could have and would have taken alternative action to avoid foreclosure.

62. Furthermore, the terms of the California Homeowner's Bill of Rights and other statutory law in effect, have imposed additional duties on Defendants as set forth herein which include: initiating contact and evaluate Plaintiffs for any and all foreclosure prevention alternatives prior to taking steps to foreclosure, evaluating Plaintiffs for foreclosure alternatives when notified of a material change in Plaintiffs' financial circumstances, and refraining from instituting foreclosure proceedings while Plaintiffs are in review for a foreclosure prevention alternative, all as alleged herein.

63. Plaintiffs allege, on information and belief, that Defendants breached their duty of care and skill to Plaintiffs, in the servicing of Plaintiffs' loan by, among other things:

    a. Engaging in a pattern and practice of making promises to Plaintiffs that Defendants' representatives knew would not be honored;

    b. Sending Plaintiffs false and misleading advertisements misrepresenting the availability of options to save Plaintiffs' home and leading Plaintiffs to

believe Wells Fargo would and could qualify Plaintiffs for a foreclosure prevention plan and avoid a trustee's sale all in a matter of days;

   c.  Failing to sufficiently train loss mitigation staff and failure to maintain adequate systems for tracking borrower documents and information that are relevant to foreclosure and loss mitigation, so that Plaintiffs could receive consistent and accurate information from one phone call to the next, and the like;

   d.  Failing to notify Plaintiffs that they were foreclosing on the Subject Property, while, in fact, telling Plaintiff the opposite, ultimately confusing and misleading Plaintiff; and

   e.  Foreclosing on the Subject Property without having the legal authority to do so.

64. Plaintiffs allege, on information and belief, that as a result of Defendants' negligence, Plaintiffs have suffered from (i) substantial arrearages, which include additional interest and fees; (ii) an adverse effect on their credit scores; (iii) a loss of the equity in their home; and (iv) being precluded from their rights and protections under the Homeowner's Bill of Rights.

65. Plaintiffs allege, on information and belief, that Plaintiffs' injury was a direct result of Defendants' negligent conduct, as Defendant's misrepresentations of the availability of obtaining a foreclosure prevention alternative was a significant factor in causing Plaintiffs' injuries. Had Plaintiffs known that Defendants would ultimately foreclose on their property, they would have sought alternative relief to prevent foreclosure and not relied on Defendants' promises of a loan modification.

66. Plaintiffs allege, on information and belief, that Defendants are responsible for

Plaintiffs' injury due to the fact that Defendants benefited from denying Plaintiffs' requests for a foreclosure prevention alternative.

67. Plaintiffs allege, on information and belief, that the policy of preventing future harm favors imposing a duty of care on an entity in Defendants' positions. In fact, this is evidenced by the fact that the State of California, through legislation, has enacted the new Homeowner's Bill of Rights, which became effective on January 1, 2013, in an effort to prevent future harm from unnecessary and wrongful foreclosures.

68. Plaintiffs are informed and believe, and on that basis, allege that had Defendants used proper skill and care in the handling of Plaintiffs' matter, Plaintiffs would have had a fair opportunity to avoid foreclosure proceedings, and Plaintiffs would have been able to enter into a loan modification that was affordable for Plaintiffs and more profitable to Defendants than a foreclosure.

69. As a direct and proximate result of the negligence and carelessness of Defendants and their representatives as set forth above, Plaintiffs have suffered, and continue to suffer, general and special damages in an amount to be determined at trial.

## VI.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE §17200

## (AS TO ALL DEFENDANTS)

70. Plaintiffs re-allege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

71. Plaintiffs bring this action against Defendants pursuant to California Business and Professions Code §17200, *et seq.,* referred to as the Unfair Competition Law (the

"UCL").

72. California Business and Professions Code §17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described herein, Defendants have engaged in unfair or fraudulent business acts or practices in violation of Bus. and Prof. Code §17200, *et. seq.*

73. The Court has jurisdiction over this action pursuant to California Bus. and Prof. Code §17200, *et seq.,* specifically Bus. and Prof. Code §17203, which provides that any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction; and the court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition; and Bus. and Prof. Code §17204, which provides for actions for any relief pursuant to the Unfair Competition Law ("UCL") to be prosecuted exclusively in a court of competent jurisdiction by any board, officer, person, corporation or association, or by any person acting for the interests of itself, its members or the general public.

74. At all times relevant to this Complaint, Defendants were lenders/trustees in the business of providing residential mortgages to the general public and were acting within the scope of that business with regard to the loan provided to Plaintiffs. Defendants have committed acts of unfair competition as proscribed by §17200 including the practices alleged herein against Plaintiffs.

75. Specifically, as fully set forth above, Defendants engaged in deceptive business

practices with respect to mortgage loan servicing, foreclosure of residential properties and related matters by, among other things:

a. Engaging in a pattern and practice of instructing borrowers, including Plaintiffs, to default on their mortgage obligation in order to be considered for a loan modification or other work out option;

b. Making misrepresentations and false promises designed to deceive Plaintiffs into thinking that they were safe from foreclosure if they were in compliance with the loan modification review process and "in review" for a foreclosure prevention alternative;

c. Misrepresenting and making false promises to Plaintiffs that they would be receiving a loan modification when Defendants knew or should have known that was not true;

d. Sending Plaintiffs false and misleading advertisements misrepresenting the availability of options to save Plaintiffs' home and leading Plaintiffs, and other similarly situated borrowers, to think that they could save their home in a matter of days if they just called Wells Fargo for help;

e. Instituting improper or premature foreclosure proceedings to generate unwarranted fees;

f. Misrepresenting the foreclosure status to Plaintiffs regarding the Subject Property; and

g. Foreclosing on the Subject Property without the legal authority to do so.

76. In addition, Bus. and Prof. Code §17200 prohibits any "fraudulent business act or practice." Defendants' concealment of material facts, as set herein, was misleading

and likely to deceive the public within the meaning of this section. This concealment was made with knowledge of its effect.

77. These violations were and remain to be a matter of Defendants' standard corporate policy, and constitute a consistent pattern and practice of unlawful corporate behavior. Defendants' actions were against public policy, as such actions precluded Plaintiffs from the opportunity to be considered for a loan modification or other foreclosure prevention alternative.

78. Furthermore, by offering assistance and leading borrowers to believe such assistance is being considered while the foreclosure process is underway is an irreparable injury to Plaintiffs after Plaintiffs have **relied on** Defendants' offer to assist them with their mortgage. This has prevented Plaintiffs from pursuing other workout options such as deed in lieu of foreclosure, short sale, repayment plan, and the like. Furthermore, the false promises and false statements of Defendants, and each of them, were designed to unfairly prejudice Plaintiffs and profit from Plaintiffs' loss by dual tracking Plaintiffs toward foreclosure during the purported modification review process, in violation of the law.

79. Defendants' acts and practices, as hereinabove alleged, constitute "unlawful" practice because they violate Title 18 United States Code §1341, §1343, and §1962, California Civil Code §1572, §1573, §1709, §1710, and §1711, and the common law.

80. Defendants' acts and practices, as hereinabove alleged, constitute "unfair" business acts under Bus. and Prof. Code §17200, *et seq.*, in that said acts and practices offend public policy and are substantially injurious to Plaintiffs and all consumers. Said acts and practices have no utility whatsoever; much less sufficient utility to

outweigh the substantial harm to Plaintiffs, other consumers, and potential homeowners.

81. Defendants' acts and practices, as hereinabove alleged, constitute "fraudulent" business acts under §17200 in that said acts and practices are likely to deceive the public and affected consumers' legal rights and obligations. Defendants' acts, including, but not limited to, active deception, falsifying documents, failing to deliver material documents, and concealment, may preclude consumers from exercising rights to which they are entitled.

82. Defendants knew, or by the exercise of reasonable care, should have known, that the representations by their representatives as herein alleged were violations of the California Homeowner's Bill of Rights, and other common law in effect.

83. Plaintiffs are informed and believe, and based thereon, allege that the illegal acts of Defendants are a serious threat to Plaintiffs because these acts have allowed, or will allow, Defendants to wrongfully foreclose on the Subject Property, to transfer title to or interest in the Subject Property, and to cause the imminent eviction of Plaintiffs from their home. Because of Defendants' illegal actions, Plaintiffs will be forced out of their home. Such eviction will cause Plaintiffs to suffer further immediate and irreparable injury, loss, and damage.

84. As a direct and proximate result of Defendants' unlawful, unfair and fraudulent conduct alleged herein, Plaintiffs are in imminent risk of losing their home. The imminent threat and risk of foreclosure constitutes injury-in-fact because it is concrete and particularized as to the property in question and initiation of foreclosure proceedings puts Plaintiffs' interest in the Subject Property sufficiently in jeopardy to constitute injury under §17200.

85. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct alleged herein, Plaintiffs have lost equity in their home. Defendants' charging of marked up and excess fees has resulted in damage to Plaintiffs' tangible interest in the Subject Property. This loss of equity, which should be credited back to Plaintiffs, constitutes a loss of money.

86. Due to Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs have suffered severe a substantial ascertainable loss, and therefore, Defendants should be enjoined from continuing such practices pursuant to Business and Professions Code §17203 & §17204.

87. As a direct, proximate, and foreseeable result of the unlawful conduct of Defendants, their business acts or practices have caused injury to Plaintiffs; and Plaintiffs are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of such business act or practice.

88. In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

//

//

## **PRAYER**

**WHEREFORE, Plaintiffs pray for judgment against each Defendant, jointly and severally, as follows:**

1. For damages sustained by Plaintiffs due to Defendants' wrongful acts in excess of the jurisdictional limits in an amount to be proven at trial;

2. Pursuant to Cal. Bus. & Prof. Code §17200, *et seq.,* that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them, be permanently enjoined from making any false or misleading statements or falsely reporting negative credit to reporting agencies, and from selling the foreclosed property on an unlawfully procured debt;

3. Pursuant to Cal. Bus. & Prof. Code §17200, *et seq.,* that this Court make such orders or judgments necessary to prevent the use or employment by any Defendant of any act which violates §17200, *et seq.;* and to restore to any person in interest, any money or property, real or personal, which may have been acquired by means of any such act;

4. For disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

5. For interest on the sum at the rate of 10% per annum;

6. For punitive damages against Defendants due to their intentional and wrongful acts;

7. For injunctive relief as set forth herein; and

8. For such other and further relief as this Court deems just and appropriate.


Dated: January 26, 2014        **LAW OFFICES OF JOSEPH R. MANNING, JR.**
                               **A PROFESSIONAL CORPORATION**


                               By: /s/JOSEPH R. MANNING, JR.
                                   Joseph R. Manning Jr., Esq.
                                   Attorneys for Plaintiffs

**Exhibit A**

ORT-703283637

RECORDING REQUESTED BY:
WORLD SAVINGS BANK

WHEN RECORDED MAIL TO:
WORLD SAVINGS BANK
FINAL DOCUMENTATION
CLOSING DEPARTMENT
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

LOAN NUMBER:0040035685

NOTE AMOUNT: $456,000.00

120-452-019-2



DOC # 2005-0027173
01/11/2005 08:00A Fee:78.00
Page 1 of 24
Recorded in Official Records
County of Riverside
Assessor, County Clerk & Recorder

| M | S | U | PAGE | SIZE | DA | PCOR | NOCOR | SMF | MISC. |
|---|---|---|------|------|----|------|-------|-----|-------|
|   |   |   | 24   |      |    |      |       |     |       |
| A | R | L |      |      |    | COPY | LONG | REFUND | NCHG | EXAM |



**DEED OF TRUST**

THIS IS A FIRST DEED OF TRUST WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR BIWEEKLY PAYMENTS OF PRINCIPAL AND INTEREST.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS DEED OF TRUST IS $570,000.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

I.    **DEFINITIONS OF WORDS USED IN THIS DEED OF TRUST**
      **(A) Security Instrument.** This Deed of Trust, which is dated **January 3, 2005,** will be called the "Security Instrument."

      **(B) Borrower. JAMES T. WILLIAMS AND STEPHANIE WILLIAMS, HUSBAND AND WIFE**
sometimes will be called "Borrower" and sometimes simply "I" or "me."

      **(C) Lender. WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES,** will be called "Lender." Lender is **A FEDERAL SAVINGS BANK** which is organized and exists under the laws of the United States. Lender's address is **1901 Harrison Street, Oakland, CA 94612** .

0 0 3

LENDER'S USE ONLY

SD001A (2004-03-1)                    DEED OF TRUST-ADJUSTABLE              CA
                                              Page 1

Exhibit A to Motion to Dismiss FAC
Page 40

0040035685

**(D)  Note.** The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$456,000.00** ("Note Amount"), plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay this debt in full by **January 24, 2035.**

**(E)  Property.** The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

**(F)  Sums Secured.** The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

**(G)  Person.** Any person, organization, governmental authority or other party will be called "Person."

**(H)  Trustor, Beneficiary, Trustee.** Borrower is the "Trustor," Lender is the "Beneficiary" and **Golden West Savings Association Service Co., A California Corporation** is the "Trustee."

**II.      BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY**

I irrevocably grant and convey the Property to the Trustee, in trust for Lender, with a power of sale subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender and Trustee those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who are beneficiaries of a deed of trust and to trustees of a deed of trust. I am giving Lender and Trustee these rights to protect Lender from possible losses that might result if I fail to:

(i)      pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

(ii)     pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)    keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

**III.     DESCRIPTION OF THE PROPERTY**
I give Trustee rights in the Property described below:

(i)      The property which is located at **1015 NIGHT HAWK CIRCLE, CORONA, CA 92881-8689**. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

(ii)     All buildings and other improvements that are located on the Described Property;

SD001B (2004-03-1)                      DEED OF TRUST-ADJUSTABLE                    **CA**
DEFERRED INTEREST                              Page 2

Exhibit A to Motion to Dismiss FAC
Page 41

Branch :WRC,User :5017                                    Comment:                                    Station Id :KSI0

0040035685

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)    All rents or royalties and other income from the Described Property;

(v)    All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)    All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)    All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)    All of the amounts that I pay to Lender under Paragraph 2 below.

**IV.    BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (i) I lawfully own the Property; (ii) I have the right to grant and convey the Property to Trustee; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself and the Trustee has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

### COVENANTS

I promise and I agree with Lender as follows:

**1.    BORROWER'S PROMISE TO PAY**

I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

**2.    PAYMENTS FOR TAXES AND INSURANCE**
    **(A)    Borrower's Obligations**

I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

SD001C (2004-03-1)                         DEED OF TRUST-ADJUSTABLE                              CA
                                                    Page 3

Exhibit A to Motion to Dismiss FAC
Page 42

0040035685

**(B)    Escrow Accounts**

      Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

      The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

      If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

      Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 28, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

SD001D (2004-03-1)                     DEED OF TRUST-ADJUSTABLE                          **CA**
                                                    Page 4

**Exhibit A to Motion to Dismiss FAC
Page 43**

Branch :WRC,User :SO17                                   Comment:                                          Station Id :KSI0

0040035685

**3.    APPLICATION OF BORROWER'S PAYMENTS**
Unless the law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay prepayment charges due under the Secured Notes;

Second, to pay any advances due to Lender under this Security Instrument;

Third, to pay the amounts due to Lender under Paragraph 2 above;

Fourth, to pay interest due under the Secured Notes;

Fifth, to pay deferred interest due under the Secured Notes;

Sixth, to pay principal due under the Secured Notes;

Last, to pay late charges due under the Secured Notes.

**4.    BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**
I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a **lien**. I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5.    BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**
At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

SD001E (2004-03-1)                    DEED OF TRUST-ADJUSTABLE                    **CA**
                                             Page 5

**Exhibit A to Motion to Dismiss FAC
Page 44**

Branch :WRC,User :5017                          Comment:                                    Station Id :KS10

0040035685

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 28 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6.   **BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS**

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

SD001F (2004-03-1)                    DEED OF TRUST-ADJUSTABLE                          CA
                                              Page 5

Exhibit A to Motion to Dismiss FAC
Page 45

0040035685

**7.     LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may, without limitation, include appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5, above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes which have not been paid. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

**8.     LENDER'S RIGHT TO INSPECT THE PROPERTY**

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

**9.     AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY**

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other government taking of the Property. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

Exhibit A to Motion to Dismiss FAC
Page 46

0040035685

**10.  CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**

  **(A)  Borrower's Obligations**
        Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

        Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

  **(B)  Lender's Rights**
        Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 28 below to demand that I make immediate payment in full of the amounts that I owe to Lender under the Secured Notes and under this Security Instrument.

**11.  OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**

        Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

        Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

        Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

**12.  MAXIMUM LOAN CHARGES**

        If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

Exhibit A to Motion to Dismiss FAC
Page 47

0040035685

**13.    LEGISLATION AFFECTING LENDER'S RIGHTS**

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

**14.    NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **1015 NIGHT HAWK CIRCLE, CORONA, CA  92881-8689**.  A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement.  I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I.(C) above entitled, "Definitions of Words Used In This Deed of Trust," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

**15.    GOVERNING LAW; SEVERABILITY**

**This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions, ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located.**  In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

**16.    BORROWER'S COPY**

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

**17.    LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY**

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 28, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by

SD001I (2004-03-1)                          DEED OF TRUST-ADJUSTABLE                                    CA
                                                         Page 9

Exhibit A to Motion to Dismiss FAC
Page 48

0040035685

Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

**18.     INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**
An **assignment** is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to any amount that I may owe Lender under the Note and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment.

**19.     CLERICAL ERRORS**
In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.     LOST, STOLEN OR MUTILATED DOCUMENTS**
If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.     WAIVER OF STATUTE OF LIMITATIONS**
I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.     CAPTIONS**
The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.     MODIFICATION**
This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.     CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**
If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

**(A)**     If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

0040035685

**(B)**     The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

**(C)**     If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a **master or blanket** policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such **master or blanket** policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such **master or blanket** policy to Lender annually.

In the event of a distribution of any hazard insurance proceeds, including without limitation any earthquake or special hazards insurance whether or not such coverage was required by Lender, in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

**(D)**     I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the **master or blanket** hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**25.     FUTURE ADVANCES**
At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

SD001K (2004-03-1)                     DEED OF TRUST-ADJUSTABLE                     **CA**
Page 11

**Exhibit A to Motion to Dismiss FAC
Page 50**

0040035685

**26.  AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)  Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)  Lender approves the creditworthiness of the transferee in writing;

(iii)  transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)  an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)  the transferee executes an assumption agreement which is satisfactory to Lender. Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with Lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**27.  SUBSTITUTION OF TRUSTEE**

I agree that Lender may at any time appoint a successor trustee and that Person shall become the Trustee under this Security Instrument as if originally named as Trustee.

SD001L (2004-03-1)                 DEED OF TRUST-ADJUSTABLE                              **CA**
                                        Page 12

**Exhibit A to Motion to Dismiss FAC
Page 51**

Branch :WRC,User :5017                          Comment:                                          Station Id :RS10

0040035685

### 28.    RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, Lender may take action to have the Property sold under any applicable law.

Lender does not have to give me notice of a Breach of Duty. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender. If the Property is sold, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

### 29.    RECONVEYANCE

Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to Borrower. Lender may charge Borrower a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (including the Trustee) for services rendered and the charging of the fee is permitted, whether expressly or by lack of express prohibition, under applicable law. If the fee charged does not exceed any maximum fee set by applicable law, the fee is conclusively presumed to be reasonable.

### 30.    STATEMENT OF OBLIGATION

Lender may collect a fee of $60.00, or such greater maximum amount as may from time to time be allowed by law, for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

SD001M (2004-03-1)                        DEED OF TRUST-ADJUSTABLE                              CA
                                                Page 13

Exhibit A to Motion to Dismiss FAC
Page 52

Branch :WRC,User :3017                                                                    Comment:                                                                    Station Id :KSI0

0040035685

**31.     (    )  QUICK QUALIFYING LOAN PROGRAM**

 I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

 If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**32.     ( X )  OWNER OCCUPANCY**

 Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

 If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

 **( X )  VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

SD001N (2004-03-1)                                    DEED OF TRUST-ADJUSTABLE                                    **CA**
                                                                    Page 14

Exhibit A to Motion to Dismiss FAC
Page 53

0040035685

**BY SIGNING BELOW,** I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_____ (Seal)
JAMES T. WILLIAMS

_____ (Seal)
STEPHANIE WILLIAMS

STATE OF CALIFORNIA Los Angeles }
COUNTY OF _Los Angeles_____ } ss.

On _1-3-05_____ before me, _Laurene E Alvarez, notary public_
personally appeared _James T Williams and_
_Stephanie Williams_____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

LAURENE E. ALVAREZ
Commission # 1379103
Notary Public - California
Los Angeles County
My Comm. Expires Oct 8, 2008

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**

SD001 (2004-03-1)       {AF1 (2004-03-1)}              Page 15                         CA
                        {AL1 (2004-03-1)}

Exhibit A to Motion to Dismiss FAC
Page 54

WORLD SAVINGS BANK, FSB

# E X H I B I T "A"
## LEGAL DESCRIPTION

LOAN NO.  0040035685

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF **RIVERSIDE** STATE OF **CALIFORNIA**, DESCRIBED AS FOLLOWS:

TAPE <u>ONLY</u> THE LEGAL DESCRIPTION TO THIS PAGE.

SD001 (2003-03-1)                    Page 16 of 16                    CA

Exhibit A to Motion to Dismiss FAC
Page 55

# EXHIBIT "A"

ORDER NO.   2607032836-37

LOT 24 OF TRACT NO. 28958-3, IN THE CITY OF CORONA, COUNTY OF
RIVERSIDE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 282 PAGE(S)
73 TO 76 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF
SAID COUNTY.

Exhibit A to Motion to Dismiss FAC
Page 56

# RIDER TO SECURITY INSTRUMENT
# AND MODIFICATION TO NOTE
## Fixed Rate Option Feature

**DATE: January 3, 2005**                    **LOAN NUMBER: 0040035685**

---

**FOR VALUE RECEIVED**, the undersigned (the "Borrower") agrees that the following provisions shall be incorporated into the Note and Security Instrument of even date herewith which were executed by the Borrower. The Security Instrument was executed by the Borrower and creates a lien in favor of **WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES** ("Lender").

This Rider to Security Instrument and Modification to Note ("Rider and Modification") is attached to the Security Instrument. To the extent that the provisions of this Rider and Modification are inconsistent with the provisions of the Note and the Security Instrument, the provisions of this Rider and Modification shall prevail and shall supersede any such inconsistent provisions in the Note and the Security Instrument. Except to the extent modified by this Rider and Modification and other rider(s) and modification(s), if any, the provisions of the Note and the Security Instrument shall remain in full force and effect. Any capitalized term not defined in this Rider and Modification shall have the meaning given to such term in the Note or the Security Instrument.

SD443A (2004-03-1)          Page 1          CA          LENDER'S USE ONLY

0 0 5

Exhibit A to Motion to Dismiss FAC
Page 57

Branch :WIC,User :JS07                                                                                          Comment:                                                                          Station Id :KS10

0040035685

**A.      Conversion Option; Conversion Period**

The Borrower has the right to convert the adjustable rate of interest under the Note to a fixed rate of interest (the "Conversion Option") at any time beginning on the first regularly scheduled payment due date following the date the Borrower could first prepay the loan in full without paying a prepayment charge under the terms of the Note, and containing until the day immediately prior to the seventh anniversary of the Borrower's first regularly scheduled payment due date under the Note (the "Conversion Period"). Unless exercised by the Borrower during the Conversion Period, the Conversion Option will expire and the adjustable interest rate provisions in the Note will remain in full force and effect. Once the Borrower exercises the Conversion Option, the Note cannot later be converted back to an adjustable interest rate.

If the Borrower's loan is payable in biweekly installments, and if the Borrower exercises the Conversion Option, the Borrower's payment schedule under the Note will automatically convert to monthly installments and the loan will be due in full on the non-accelerated Maturity Date stated in the Note.

**B.      Conditions to Exercising the Conversion Option**

The Borrower can exercise the Conversion Option only if the Borrower has: (i) made all of the payments due under the Note and the Security Instrument prior to the exercise of the Conversion Option; (ii) made no more than two (2) payments under the Note more than 15 days after their regularly scheduled due dates during the 12-month period immediately preceding the exercise of the Conversion Option; and (iii) met all other terms and conditions of the Note and the Security Instrument.

**C.      Calculating the Fixed Rate**

The fixed rate of interest that will apply upon the exercise of the Conversion Option (the "Conversion Rate") will be calculated by adding **1.000** percentage points to the then current Federal National Mortgage Association's required net yield for 30-year fixed rate mortgages covered by applicable 60-day mandatory delivery commitments [expressed as a percentage] (the "FNMA Rate"). This calculation will be made at the time and in the manner described in paragraph D of this Modification and Rider. Any periodic interest rate change limitation in the Note will not apply to the fixed rate conversion, but in no event will the Conversion Rate be higher than the lifetime interest rate cap set forth in the Note.

The Borrower understands that the FNMA Rate fluctuates and that the fixed rates available during the Conversion Period may be substantially higher than the fixed rate available at the time the Borrower's loan is made. In the event the FNMA Rate is no longer quoted, the Lender will select an alternative rate source.

SD443B (2004-03-2)      [B01 (2004-03-2]]            Page 2                              **CA**
BROKERS COMPENSATION

**Exhibit A to Motion to Dismiss FAC
Page 58**

0040035685

*The Borrower may ask for the then current FNMA Rate by calling the Lender's fixed rate conversion representatives at the toll-free customer service number given on the Borrower's monthly statement.*

**D.      Exercising the Conversion Option**

To exercise the Conversion Option, the Borrower will take and complete the following steps **before** the end of the Conversion Period.

**1. Lock-in the Fixed Conversion Rate**

The Borrower will first obtain a Conversion Rate from the Lender by calling the Lender's fixed rate conversion representatives at the toll-free customer service number given on the Borrower's most recent monthly statement. The Lender will calculate the Conversion Rate as of that day, using the last quoted FNMA Rate from the immediately preceding business day. The Conversion Rate will be binding on the Borrower and the Lender for fourteen **(14)** days (the "Exercise Period") following the Borrower's telephone confirmation of the desire to exercise the Conversion Option.

**2. Notice to Convert; Conversion Fee**

After the Borrower obtains the Conversion Rate in the manner set forth above, the Lender will furnish the Borrower with a written notice to convert (the "Conversion Notice"). The Borrower will sign the Conversion Notice and return it to the  Lender along with a conversion fee of U.S. **$200.00 (the "Fee"). Notwithstanding any notice provision to the contrary in the Note or the Security Instrument, the Conversion Option will be exercised only if the Conversion Notice and Fee are actually received at World Savings, Attn: Customer Service Administration, 4101 Wiseman Boulevard, Bldg. 106, San Antonio, Texas 78251, or at such other address as designated by the Lender in the Conversion Notice, prior to the end of the Exercise Period; otherwise, the Borrower must obtain a new Conversion Rate and start a new Exercise Period. The Borrower bears all risk of delivery, including, without limitation, the risks of non-delivery, misdelivery, loss or destruction.**

Notwithstanding anything to the contrary in this Rider and Modification, if the Borrower fails for any reason to exercise the Conversion Option in the manner described above after obtaining three (3) Conversion Rates and Exercise Periods, the Conversion Option will terminate and can no longer be exercised.

Exhibit A to Motion to Dismiss FAC
Page 59

0040035685

E.    **New Monthly Payment Amount**

      The Lender will calculate the Borrower's new monthly principal and interest payment after receiving the signed Conversion Notice and Fee during the Conversion Period. The Borrower's new monthly payment will be an amount sufficient to pay, in substantially equal payments by the Maturity Date, the unpaid principal balance of the Note (including any Deferred Interest) plus interest charged at the Conversion Rate. The payment change limitations in the Note do not apply to the fixed rate conversion.

      If the Lender receives the Conversion Notice and Fee fifteen (15) days or more before the last day of the calendar month in which the Conversion Notice and Fee are received, unpaid principal will accrue interest at the Conversion Rate beginning on the fifteenth (15th) day of the following calendar month. If the Lender receives the Conversion Notice and Fee less than fifteen (15) days before the last day of the calendar month in which the Conversion Notice and Fee are received, unpaid principal will accrue interest at the Conversion Rate beginning on the fifteenth (15th) day of the second following calendar month. The date on which the Conversion Rate is first in effect is called the "Conversion Date." Interest will continue to accrue on unpaid principal in accordance with the adjustable interest rate provisions of the Note up to, but not including, the Conversion Date. The Borrower will continue to make all regularly scheduled biweekly payments in accordance with the adjustable interest rate provisions of the Note through and including any payment that falls due on the Conversion Date. Interest that accrues at the adjustable rate from the last scheduled biweekly payment until the Conversion Date will be added to principal and interest on it will accrue at the Conversion Rate. The Borrower's first monthly installment payment will be due one month from the Conversion Date. Subsequent monthly payments will be due on the same day of each following month.

      *For example, if the Lender receives the Conversion Notice and Fee on March 10, which is more than fifteen (15) days before the end of that month, the Conversion Rate will first be charged on April 15 and the new monthly payment amount will first be due on May 15. The adjustable rate will be charged through April 14 and the Borrower pays all scheduled biweekly payments due through and including April 15. If the Conversion Notice and Fee were received March 20, which is less than 15 days before the end of that month, the Conversion Rate would be charged beginning on May 15 and the first fixed rate monthly payment would be due June 15. The adjustable rate would be charged through May 14 and the Borrower would pay the biweekly payments due through and including May 15.*

      The Lender will notify the Borrower of the amount and effective date of the new fixed-rate monthly payments.

SD443D (2004-03-1)    [D01 (2004-03-1)]         **Page 4**               **CA**
BIWEEKLY

**Exhibit A to Motion to Dismiss FAC
Page 60**

Branch :WRC,User :5017                          Comment:                          Station Id :KSI0

0040035685

**F.** **Loan Not Assumable and Due-On-Sale After Conversion to a Fixed Rate**

Notwithstanding any provision to the contrary contained in the Note or the Security Instrument, if the Borrower exercises the Conversion Option, the Borrower's loan may not be assumed by any other person. If the Borrower sells or transfers all or part of the Property after exercising the Conversion Option, then the Lender may, at any time, require the Borrower to pay immediately and in full all amounts owing under the Note and the Security Instrument. If the Borrower's loan is otherwise assumable, a person who assumes the loan secured by the Security Instrument prior to the exercise of the Conversion Option also assumes the Conversion Option on the terms and conditions set forth in this Rider and Modification.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

SD443E (2004-03-1)                          Page 5                                    CA

Exhibit A to Motion to Dismiss FAC
Page 61

Branch :WRC,User :3017                    Comment:                    Station Id :RSI0

0040035685

**IN WITNESS WHEREOF,** the undersigned has executed this Rider and Modification on the _3rd_ day of _January 2005_.

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_signature_ (Seal)

JAMES T. WILLIAMS

_signature_ (Seal)

STEPHANIE WILLIAMS

STATE OF CALIFORNIA                    }
                                       }ss.
COUNTY OF _Los Angeles_                }

On _1-3-05_ before me, _Laurene E. Alvarez, notary public_, personally appeared _James T. Williams and Stephanie Williams_ _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

LAURENE E. ALVAREZ
Commission # 1379908
Notary Public - California
Los Angeles County
My Comm. Expires Oct 8, 2008

(This area for official notarial seal)

3008 (1/91) — (General) First American Title Company

**Exhibit A to Motion to Dismiss FAC
Page 62**

Branch :WRC,User :3017      Comment:      Station Id :KS10

Government Code 27361.7

I certify under penalty of perjury that the notary seal on the document to which this statement is attached reads as follows:

Name of notary: Laurene E. Alvarez

Commission No.: 1379103

Date Commission expires: Oct 8, 2006

County: Los Angeles

By: 

Date: 1/11/05

Exhibit A to Motion to Dismiss FAC
Page 63

**Exhibit B**

**DOC # 2011-0551174**
12/13/2011 03:01 PM Fees: $27.00
Page 1 of 4
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

Recording requested by:
LSI Title Company

When Recorded Mail To:
NDEx West, L.L.C.
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013

APN #: 120-452-019-2
Property Address:
1015 NIGHT HAWK CIRCLE
CORONA, CALIFORNIA 92881

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: QHENSON

DFF20110015006549

*Space above this line for Recorder's use only*

Trustee Sale No. : 20110015006549          Title Order No.: 110581722

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION, and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this Notice of Default may be recorded (which date of recordation appears on this notice).**

This amount is $18,725.12 as of 12/12/2011 and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor

FCUS_NoticeOfDefault.rpt - Record - (10/17/2011) - Ver-33                              Page 1 of 3

Exhibit A to Motion to Dismiss FAC
Page 65

Case 5:13-cv-02075-JVS-DTB   Document 23-2  Filed 03/12/14  Page 76 of 79   Page ID #:732

DOC # 2011-0551174
Page 2 of 4  12/13/2011 03:01 PM

**IMPORTANT NOTICE**
NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

Trustee Sale No. : 20110015006549          Title Order No.: 110581722

permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**WELLS FARGO BANK, N.A., A/K/A WACHOVIA MORTGAGE, A DIVISION OF WELLS FARGO BANK, N.A. AND F/K/A WACHOVIA MORTGAGE, FSB**
c/o NDEX WEST, LLC
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013
(866) 795-1852

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.
Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

**NOTICE IS HEREBY GIVEN THAT: NDEX WEST, LLC** is the original Trustee, duly appointed Substituted Trustee, or acting as Agent for the Trustee or Beneficiary under a Deed of Trust dated 01/03/2005, executed by JAMES T. WILLIAMS AND STEPHANIE WILLIAMS, as Trustor, to secure obligations in favor of WORLD SAVINGS BANK, FSB, as Beneficiary Recorded on 01/11/2005 as Instrument No. 2005-0027173 of official records in the Office of the Recorder of RIVERSIDE County, California, as more fully described on said Deed of Trust. Including a Note(s)/ Unconditional Guaranty which had a principal amount of $456,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the Beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of:

**THE INSTALLMENT OF PRINCIPAL AND INTEREST WHICH BECAME DUE ON 5/15/2011 AND ALL SUBSEQUENT INSTALLMENTS, TOGETHER WITH LATE CHARGES AS SET FORTH IN SAID NOTE AND DEED OF TRUST, ADVANCES, ASSESSMENTS, FEES, AND/OR TRUSTEE FEES, IF ANY.**

**NOTHING IN THIS NOTICE SHALL BE CONSTRUED AS A WAIVER OF ANY FEES OWING TO THE BENEFICIARY UNDER THE DEED OF TRUST, PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.**

Exhibit A to Motion to Dismiss FAC
Page 66

Branch :WRC,User :3017                                    Comment:                                      Station Id :KS10

DOC # 2011-0551174
Page 3 of 4  12/13/2011 03:01 PM

IMPORTANT NOTICE
NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

Trustee Sale No. : 20110015006549          Title Order No.: 110581722

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said agent, a written Declaration of Default and Demand for same, and has deposited with said agent such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

DATED: 12/12/2011

NDEX WEST, LLC as Agent for Beneficiary

By: _____ Gregory Peck

FCUS NoticeOfDefault.rpt - Record - (10/17/2011) - Ver-33                                        Page 3 of 3

Exhibit A to Motion to Dismiss FAC
Page 67

Branch :WRC,User :3017                    Comment:                                    Station Id :KS10



Wachovia Mortgage
P.O. Box 659558
San Antonio, TX 78265-9558

DOC # 2011-0551174
Page 4 of 4  12/13/2011 03:01 PM

James T Williams **WACHOVIA**

### Declaration of Wells Fargo Bank, N.A.

As required by California Civil Code Section 2923.5, I, *Sylia Lopez* an officer of Wells Fargo Bank, N.A., declare as follows:

Regarding James T Williams (hereinafter referred to as "borrower"), Wells Fargo Bank, N.A., has met the requirement of California Civil Code Section 2923.5 as indicated below.

( ) Wells Fargo Bank, N.A., has contacted the borrower as set forth in California Civil Code Section 2923.5(a)(2).

(x) Wells Fargo Bank, N.A., has tried with due diligence, as prescribed by California Civil Code Section 2923.5(g), to contact the borrower.

The undersigned authorizes the trustee, foreclosure agent and/or their authorized agent to sign, on behalf of the beneficiary/authorized agent, the Notice of Default containing the declaration required pursuant to Civil Code 2923.5.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

11/29/11
Date

By: _____
Title: Vice President Loan Documentation

FP006 012 LLY

Wachovia Mortgage is a division of Wells Fargo Bank, N.A.          L-11740 Rev02 (10/07)

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am over the age of 18 and am not a party to this action.  I am employed in the City of Pasadena, California; my business address is 199 S. Los Robles Avenue, Suite 600, Pasadena, California 91101-2459.

On March 13, 2014, I served a copy of the foregoing document entitled:

**DEFENDANT WELLS FARGO'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**

on all interested parties in said case as follows:

**Served Electronically Via The Court's CM/ECF System:**

| | |
|---|---|
| *Counsel for Plaintiffs*<br>*James Williams & Stephanie Williams:* | *Counsel for Defendant*<br>*NDeX WEST, LLC* |
| Joseph R. Manning, Jr., Esq.<br>THE LAW OFFICES OF JOSEPH R. MANNING, JR.<br>4667 MacArthur Boulevard, Suite 150<br>Newport Beach, CA  92660 | Edward A. Treder, Esq.<br>BARRETT DAFFIN ET AL.<br>20955 Pathfinder Road, Suite 300<br>Diamond Bar, CA  91765 |
| Tel:  (949) 200-8755<br>Fax:  (866) 843-8308 | Tel: (626) 915-5714<br>Fax: (909) 595-7640 |
| manningjr@aol.com | edwardt@bdftw.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  This declaration is executed in Pasadena, California, on March 13, 2014.

| | |
|---|---|
| _____<br>Jill Ashley<br>*(Print Name)* | _____<br>*/s/ Jill Ashley*<br>*(Signature of Declarant)* |

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP